```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - - -
                                         )
 5   JANET AVILES,                       )
                                         )
 6          Plaintiff,                   )
                                         )
 7   v.                                  )    CRIMINAL ACTION NO.
                                         )    2:16cv58
 8   BAE SYSTEMS NORFOLK SHIP            )
     REPAIR, INC., AND BAE SYSTEMS       )
 9   SHIP REPAIR, INC.,                  )
                                         )
10          Defendants.                  )
     - - - - - - - - - - - - - - - - - - -
11

12

13                  TRANSCRIPT OF PROCEEDINGS

14                     Norfolk, Virginia

15                     November 6, 2017

16

17   BEFORE:  THE HONORABLE ROBERT J. KRASK
             United States Magistrate Judge
18

19

20   APPEARANCES:

21           FRIEDMAN & HOULDING, LLP
             By:  Giselle B. Schuetz
22                Counsel for the Plaintiff

23           PAUL HASTINGS JANOFSKY & WALKER LLP
             By:  Carson H. Sullivan
24                Counsel for the Defendants

25
```

```
 1              (Hearing commenced at 11:04 a.m.)

 2              THE CLERK:  Janet Aviles v. BAE Systems Norfolk

 3    Ship Repair, Inc., et al., case 2:16cv58.

 4              Are counsel ready to proceed?

 5              MS. SCHUETZ:  Yes.

 6              MS. SULLIVAN:  Good morning, Your Honor.  I'm

 7    Carson Sullivan for the defendants.  With me is Marcy

 8    Cornfield from BAE.  How would you like to proceed?

 9              THE COURT:  Yes.  So this Court, even though I tend

10    to be a little less formal than perhaps some of the judges,

11    things are rather formal here.  So you stand when you

12    address the Court, and you make your argument from the

13    podium.

14              MS. SULLIVAN:  Great.  Did you want to introduce

15    yourself?

16              MS. SCHUETZ:  Sure.

17              Your Honor, I'm Giselle Schuetz here for the

18    plaintiff.

19              THE COURT:  Very well.  Good to see you,

20    Ms. Schuetz.  Give me just one moment to get set up, and

21    then we will start with counsel for BAE.

22              Okay, Ms. Sullivan.  Sorry about that.  You ready

23    to go?

24              MS. SULLIVAN:  Yes.  Thank you, Your Honor.  Can

25    you hear me okay?
```

```
 1              THE COURT:  I can.

 2              MS. SULLIVAN:  Is it too loud?

 3              THE COURT:  You can pull that down a little bit if

 4     you'd like.

 5              MS. SULLIVAN:  All right.  Again, Carson Sullivan.

 6     Thank you for hearing us today.  These are on defendants'

 7     motions to compel on the privilege issues, which I know

 8     you're aware of them.  It's EFC 42, 43 and 46, are where our

 9     motions start.

10              Just a brief background.  I know that we have

11     covered it in our papers, but the crux of why we are here is

12     because on February 11th, 2015, plaintiff's treating

13     physician took her out of work, said she was unsafe to work

14     in the shipyard environment.  BAE, relying on the doctor's

15     medical opinion, informed Ms. Aviles, through her counsel,

16     that she was going to be placed on a disability leave.  She

17     has remained on leave.  She has not been reinstated.

18              She filed suit against BAE making multiple claims,

19     Title VII, that she was retaliated against for participating

20     in a previous class action that had since been settled, and

21     violation of Title VII because of her sex, that she has been

22     treated differently than other males in the shipyard, and

23     also violation of the ADA.

24              THE COURT:  You said "she," is she still on

25     disability at this time?
```

1          MS. SULLIVAN:  She is, yes, and she is receiving
2     workers' compensation benefits.
3          So the problem with this is that the plaintiff,
4     over three months after she was put out of work, she signed
5     a full release.  We reached an agreement in the class action
6     lawsuit, but there was also a supplemental release, which is
7     kind of a typical for named plaintiffs and class
8     representatives where she signed a supplemental release, not
9     just releasing the claims in the lawsuit but all claims, and
10    that was on May 18th, 2015.  She was paid substantial
11    consideration for that supplemental release.  Again, that
12    was on May 18th she released all known and unknown claims.
13         She then filed suit against BAE alleging claims
14    that we believe were clearly released.  We initially filed a
15    motion to dismiss -- I think that is ECF number 8 -- where
16    we moved to dismiss the initial complaint in its entirety.
17    She did not respond to that motion and, instead, filed an
18    amended complaint.  The amended complaint, I think, is ECF
19    number 19.
20         In that she -- and I have a comparison document,
21    you know, where you can do a redline and see -- she added
22    some very specific allegations about her knowledge and her
23    counsel's knowledge and beliefs and conclusions.
24         THE COURT:  I'm aware of the three paragraphs.
25    Just in your estimation, and I haven't held them side by

1    side, but I know there is some mixing up and movement of

2    some of the paragraphs, but how much additional information

3    is contained in the amended complaint?

4         MS. SULLIVAN:  I have one copy of this.  I'm happy

5    to e-mail it to you afterwards.  All it is, is a comparison

6    of the two.  I think that other than those, there might have

7    been one other paragraph that was added to the complaint.  I

8    have it here, but those were the main ones, and those are

9    the ones that we believe are at issue here.  To the amended

10   complaint we filed a motion to dismiss, and they opposed

11   that, obviously, with briefing.

12        The paragraphs at issue are Paragraph 31, Paragraph

13   37 and Paragraph 67.  In them, in Paragraph 31 states,

14   "Mr. Friedman" -- that is counsel for the plaintiff --

15   "accepted Ms. Sullivan's" -- that's me -- "representations

16   that BAE was not acting in bad faith or on account of

17   Ms. Aviles' protected activity and the representation that

18   should the agreed doctor opine that Ms. Aviles could work

19   safely, she would be allowed to return to work."

20        Now, I'm going to try very hard not to interject my

21   opinions of the merits.

22        THE COURT:  That would be good.  Advisable unless

23   you want to get out of the case.

24        MS. SULLIVAN:  No, not going to do that.  But the

25   pleading is Mr. Friedman accepted, and that is in Paragraph

31.   In Paragraph 37, quoted directly from the complaint,
"On May 18th, 2005, Ms. Aviles and her counsel reasonably
believed, based on written and verbal representations of
BAE's counsel that BAE was engaged in a good-faith process,
that would result in her return to work."  That is May 18th,
the day she signed the release.

In Paragraph 67, "After May 21st, Mr. Friedman
concluded that BAE had acted to exclude plaintiff from the
shipyard because of her protected activity, and that its
willingness to reinstate her based on Dr. Gershon's opinion
had been a charade, intended to conceal its motive."

THE COURT:  Let me ask you about those three
paragraphs.  Certainly, one of the questions I have is how
do such of these paragraphs disclose or describe
attorney-client communications?

Now, they certainly reference Mr. Friedman's state
of mind with respect to acceptance, belief and conclusions
that he may have reached as discussed in those paragraphs,
but how do they disclose or describe attorney-client
communications?

MS. SCHUETZ:  Well, I think that your point that
you said, is that they rely on her state of mind, which is
exactly what we are arguing here.  They don't say he told
her that, but in effect what they have done is they have
used this as a sword to overcome the motion to dismiss, his

1    conclusions, his reasonable beliefs, that they have used

2    that to overcome the motion to dismiss.

3         Now they are trying to shield the reasons behind it

4    and the communications behind it, which we believe will show

5    absolutely that they were aware that there was cause of

6    action when Ms. Aviles signed the release and Mr. Friedman

7    recommended that she sign the release.

8         By being deprived of that information, we

9    are essentially back at where we started with the motion to

10   dismiss, because Judge Allen stated in her opinion -- and

11   let's see.  She said, "Plaintiff alleges that when she

12   signed the agreement, defendants were 'engaged in a

13   good-faith process, that would result in plaintiff's return

14   to work,' Am. Compl. 6, ECF 19.  However, after signing the

15   agreement, plaintiff came to believe that defendants'

16   willingness to reinstate plaintiff 'had been a charade,

17   intended to conceal its motive.'"  She cites exactly to the

18   paragraph that they added that referred to Mr. Friedman's

19   state of mind, his conclusions, and his beliefs.

20        So that is why we believe there is a waiver of the

21   attorney-client privilege and the work-product doctrine

22   there.  The case law is, and I will go through a few of the

23   cases.  It is about -- you know, an analogy would be the

24   defense, you know, the advice of counsel defense, very

25   similar.  Of course, this isn't a defense so it's a little

1    different, and you're not always going to find the exact

2    scenario here, but we believe that's exactly what they're

3    doing.

4           In fact, some of the cases they don't call it the

5    advice of counsel issue; they call it the at-issue.  You put

6    something at issue in a case, and then you deprive the other

7    side of the ability to get discovery on it.  Now, Judge

8    Allen said in her opinion, "In sum, plaintiff contends that

9    the claims asserted in her amended complaint did not yet

10   exist when she signed the release.  At this stage, the Court

11   must assume plaintiff's alleged facts are true and draw all

12   reasonable inferences in her favor.  Accordingly, the Court

13   is compelled to deny" the motion to dismiss.

14          I feel like -- I know we are right back to where we

15   were because we asked very targeted discovery on those

16   paragraphs.  We are not claiming a subject matter waiver of

17   everything in the case, but we asked targeted discovery on

18   that, and we asked targeted deposition questions, and all of

19   them have not been answered on the reliance of the

20   attorney-client privilege or the work-product doctrine.

21          THE COURT:  Let me ask you about that.  So what is

22   outcome determinative here is when these claims accrued,

23   correct?

24          MS. SULLIVAN:  Yes.

25          THE COURT:  Isn't the law in the Fourth Circuit, in

JODY A. STEWART, Official Court Reporter

1    essence, that what the Court has to consider is when the

2    plaintiff knew or reasonably should have known of an adverse

3    employment action by the defendant?  Presumably, if she knew

4    or reasonably should have known on or before May 18th, then

5    you have your contract argument that she entered into a

6    binding agreement and waived those claims.  If she didn't

7    know or reasonably should not have known prior to that date,

8    then arguably she has such claims.  Would you agree with

9    that?

10           MS. SCHUETZ:  That's exactly right, Your Honor.

11   Our position would be that the adverse action occurred on

12   February 11th -- well, actually, February 12th was her first

13   day out of work.  She obviously knew she was out of work

14   then.

15           THE COURT:  But what I'm getting at is what's in

16   her mind.  She knew or reasonably should have known.  I

17   guess the question I have is, then, so that the other

18   predicate to discovery is relevance.  At least part of the

19   Court's concern is why is it relevant that Mr. Friedman

20   thought something or believed something or accepted

21   something unless it touches upon informing her state of

22   mind?

23           MS. SULLIVAN:  Right, and then that's what I was

24   saying.  If we didn't have this whole side issue of the

25   release and all of that, I think it would be clear that the

1    adverse employment action happened when she was taken out of
2    work.  But, yes, she had not answered questions about why
3    she signed the release on May 18th, even though she hadn't
4    been put back to work.  She said she relied on advice of
5    counsel, and there's been -- we have no evidence, and we
6    have nothing from Mr. Friedman -- you know, every question
7    surrounding it he has -- his counsel objected to any of
8    that.
9            So we have no way of proving what we are fairly --
10   very certain to be the case that he knew there were causes
11   of action and that she knew there were causes of action, or
12   if she did not, then it is because he did not tell her
13   something happened there.  But the case law -- I mean, there
14   is cases in the Fourth Circuit.  There is a case that we
15   cited in our motion to dismiss that is very on point.  It's
16   not Fourth Circuit.  I think it's Third Circuit from 2004.
17           THE COURT:  What is the case?
18           MS. SULLIVAN:  The case is *Zdziech v.*
19   *DaimlerChrysler Corporation.*
20           THE COURT:  The cite?
21           MS. SULLIVAN:  The cite is 114 Fed.Appx. 469, 2004.
22           THE COURT:  Okay.  Thank you.
23           MS. SULLIVAN:  And in that case the defendant
24   placed Zdziech on a disability leave.  This is what the
25   Court said, "This act, Zdziech argues, constituted unlawful

1   discrimination."  He filed a complaint that -- they did not

2   reinstate him.  During the period, it was about two years,

3   he sent repeated requests to be returned to work so kind of

4   similar to what's happening here, which were either refused

5   or ignored.  And the Court said very clearly, "We agree with

6   the judgment of the District Court that Zdziech's rights

7   under the ADA fully ripened on October 27th, 1998, when

8   DaimlerChrysler placed him on disability leave."

9          And the Court said that, "The repeated refusal of

10  an employer to..." bring someone back, that that is not an

11  independent -- it's not like a continuing violation like you

12  might think of in some other kind of case -- "...does not

13  give rise to a new claim of discrimination," and if it did,

14  that would eviscerate the statute of limitations.

15         So that would be our argument, that the only way

16  that they were able to overcome these cases and cases like

17  this.  There is one from the Fourth Circuit that's similar.

18  It's not exactly the same because it wasn't a disability

19  leave.  I think it was a termination.  But that case is

20  *Martin v. Southwestern Virginia Gas Company*, 135 F.3d 307,

21  1998.  Very similar, it talks about eviscerating the statute

22  of limitations.  But the way that they were able to get

23  around that was that by pleading that they weren't aware

24  that there was a cause of action on May 18th.  We don't find

25  that believable in any way, particularly given the mountain

1    of other evidence in the case, that we tried to depose the

2    plaintiff and Mr. Friedman on, and we were not given any --

3    we weren't able to get any responses to that.

4         THE COURT:  Let me go back to my question, though,

5    and if you can try and answer it, is if Mr. Friedman didn't

6    communicate a belief or some fact or some knowledge that he

7    had to her, why is any of that relevant, that he held

8    beliefs or opinions?  So to the extent you are seeking

9    discovery about information that he did not pass on to

10   Ms. Aviles, why is it relevant?  If it's not relevant, then

11   you don't get discovery on it.

12        MS. SULLIVAN:  No, I didn't mean to suggest that.

13   I think he probably did pass it on to her.

14        THE COURT:  I'm saying if there are opinions and/or

15   facts that he knew, or conclusions that he reached, do you

16   seek discovery of those if he did not, in fact, pass them on

17   to Ms. Aviles?

18        MS. SULLIVAN:  I think I do because otherwise --

19   well, if he didn't -- but he still advised her to sign the

20   release, then I think there is a bigger issue.  It's still

21   the same result, that he advised her not to sign the

22   release -- I mean, to sign the release.  And so I assume

23   that he explained to her -- I just don't know.  So if he

24   formed some opinion that he never shared with her --

25        THE COURT:  I mean, attorneys think about lots of

 1    things and strategize about lots of ideas, and at least part

 2    of the concern of the opinion work-product doctrine is, is

 3    that really what's going on in the attorney's head should be

 4    sacrosanct unless, of course, it's waived.  But, otherwise,

 5    particularly in the Fourth Circuit, the cases talk about

 6    that it's nearly sacrosanct, that there may be extraordinary

 7    cases in which you can get discovery of that.

 8          Certainly, waiver would qualify and open the door,

 9    but I guess the question I have is if he never passed on

10    some of these thoughts that you want to ask him about to the

11    plaintiff, I'm not sure why you're entitled to discover that

12    in this case.

13          MS. SULLIVAN:  As opposed to?

14          THE COURT:  Because what's significant is what she

15    knew or reasonably should have known with respect to any

16    adverse employment action.

17          MS. SULLIVAN:  Well, Your Honor, I agree with you

18    for the most part.  However, I think this is that exception

19    because I think that by putting in his reasonable beliefs

20    and his conclusions into that amended complaint in order to

21    survive the motion to dismiss, and in making the arguments

22    that they made in their motion to dismiss, that that takes

23    it out of the normal circumstances.  It's that he

24    concluded -- I mean, especially the May 21st one.  It

25    doesn't even say plaintiff concluded.  It says he concluded.

1    I think we are entitled to understand why he concluded that,

2    particularly when the weight of the evidence, which I will

3    go through, is contrary to that.

4         So I think that's the difference.  In the motion to

5    dismiss, or in their opposition to the motion to dismiss

6    their whole thing was plaintiff and her counsel did not

7    become aware of plaintiff's claims until after plaintiff

8    signed the release.  That's on page -- that's it.  That's in

9    their motion to dismiss.

10        They also argued that they were unaware of the

11   claims until after May 18th.  I think that's the difference.

12   There is even a section in their brief that says that

13   defendant, including me personally, which I will not

14   discuss, engaged in misleading conduct that caused her to

15   unknowingly to, in effect, abandon her claims.

16        All of that, Mr. Friedman, in pleading that amended

17   complaint, has interjected himself into all of this, and the

18   Court relied on those paragraphs.  So I think that's the

19   main difference.  There aren't a whole lot of cases that

20   deal with these issues, because, thankfully, they don't come

21   up that much.

22        But there is a case that we've cited a number of

23   times, and it's not -- it's a Federal Court in West

24   Virginia.  But it's that *JJK Mineral* case.  In that case the

25   Court said, "Good faith belief is a state of mind.  Swiger

1    alleges that he received and relied on the advice of the

2    Daniels Law Firm with respect to suing JJK in state court."

3    Because basically sort of a similar situation where JJK

4    went -- there was a full release between these two parties,

5    and then this plaintiff -- well, not the plaintiff in this

6    case -- sued again, and so the issue was what was the good

7    faith belief for being able to bring that when you had the

8    release.  So kind of a similar issue.

9            This case is good because it's relatively recent,

10   and it goes through a lot of the positions on the different

11   kinds of work product and privilege and what the courts have

12   said.  And in this one the Court said -- it goes into great

13   detail about opinions and lots of cases, but it says,

14   "Fundamental fairness compels the conclusion that a litigant

15   may not use reliance on advice of counsel to support a claim

16   or defense as a sword in litigation, and also deprive the

17   opposing party the opportunity to test the legitimacy of

18   that claim by asserting the attorney-client privilege or

19   work-product doctrine as a shield.  This court joins those

20   courts that have held the defendant, having waived the

21   privilege by asserting the advice of counsel defense, must

22   produce not only attorney-client communications, but also

23   all documents relied upon or considered by counsel in

24   rendering the opinions."

25           Again, while this is not a straight up advice of

1    counsel defense because, obviously, they're not the defense,
2    they are the plaintiff, we believe that it is a very similar
3    situation, and the Court goes on at length again at the
4    back, "Good faith belief is a state of mind."  And that's,
5    since he pled that that, "JJK must be able to discover the
6    information that was conveyed by Swiger to counsel and vice
7    versa, discover what facts were provided by Swiger to the
8    Daniels Law Firm; discover what facts the Daniels Law Firm
9    may have obtained from any other sources other than Swiger;
10   discover the legal research conducted by and considered by
11   the Daniels Law Firm; discover the opinions of the Daniels
12   Law Firm gave Swiger," and it goes on and on, and it says
13   you can't selectively ignore any of the facts or opinions
14   because that's the crux of the allegations in this case.
15   And they used it to say the reason that we filed, even
16   though we had a release, is because of counsel's good faith
17   belief.
18        While the amended complaint doesn't say good faith
19   belief, it certainly says concluded, it certainly says
20   reasonably believed, and it certainly says accepted my
21   representations.  That's all counsel, not Ms. Aviles.  So
22   that case is very comprehensive.  I wish it were in the
23   Fourth Circuit, but -- or, actually, I guess it is.  It is
24   West Virginia.  It's not a Fourth Circuit opinion, but it's
25   a District Court opinion, and it's pretty comprehensive.

1           The other privilege cases that we cited, the waiver

2    cases, again *JJK*, the *Hearn v. Rhay* case, that was a

3    criminal case but it's an older case that goes for that

4    whole proposition about you can't place information at issue

5    and then deprive the opposing party of something that's

6    critical to its defense.

7           The *Brown University v. Tharpe* case, that's EDVA

8    2012, 2012 Westlaw 12894480, that one kind of goes to this

9    issue of it doesn't have to be advice of counsel.  There is

10   an advice of counsel that happened here, and deposition

11   questions were not answered because of that.  But that Court

12   calls it the at-issue waiver, and I really think that's what

13   we should be referring to it here.

14          In that case it talked about the state of mind of

15   the attorneys, and in that case they didn't find a waiver,

16   but the legal principles in it are important, and they also

17   talk about work product and that that too can be waived.

18          So we have, in our papers, we listed the document

19   requests.  It was document request 21.

20          THE COURT:  Let me ask you about that.

21          MS. SULLIVAN:  Yes.

22          THE COURT:  So I have a question about 21 and 25.

23   With respect to 21, this kind of goes back to what I was

24   asking before, but why is it relevant whether Mr. Friedman

25   accepted your March 13th representation about acting in good

1    faith and giving her sort of another bite of the apple with

2    respect to a doctor's opinion?  Whether he accepted or not,

3    what's the relevance of that?  How does that tend to make

4    any fact pertinent to this case, you know, more or less

5    likely?

6              MS. SULLIVAN:  Well, that's the whole thing, is

7    that they are trying to make this their -- they have argued

8    and they are trying to make it that they believed we were --

9    he believed, he accepted what I said, which, of course,

10   again, not going to get into what I actually said, but they

11   are using this to overcome -- all three of these

12   paragraphs -- to overcome a motion to dismiss because -- as

13   to why they believe, he believed, he advised her, that the

14   cause of action didn't accrue because they didn't think they

15   had one.  They weren't aware of one.  That's all part of his

16   saying that, you know, I will give you -- he used accepted

17   my representations versus reasonably believed or concluded

18   because the other two, I think, are a little stronger.  But

19   that's all part and parcel with the other ones as to why

20   they're claiming that there was this grand charade and that

21   the cause of action didn't accrue until later.

22             THE COURT:  So you're saying, in essence, that that

23   information arguably rebuts the claim that the adverse

24   employment action occurred in February?

25             MS. SULLIVAN:  Yes.  That's the whole thing that

1    they were trying to get around because, you know, especially

2    the cases that I was reading you, the one from the Third

3    Circuit and the Fourth Circuit, the adverse action did occur

4    in February.  We believe, and we argued in both motions to

5    dismiss, that everything was barred by that full release she

6    signed in May.

7            All of these additions were added to get around

8    that motion to dismiss to say, wait a minute.  We thought we

9    were going to have some other deal.  We thought you were

10   going to bring her back, and so, therefore, we can't -- May

11   18th, the cause of action accrued after May 18th.

12           THE COURT:  All right.  Let me ask you about

13   request number 25.  Just one second.  I want to find the

14   place in plaintiff's brief where they suggest how that

15   particular request could be narrowed.

16           So plaintiff suggests it should be limited to

17   documents, to the extent I find any waiver of privilege or

18   work product, that counsel believed or advised plaintiff

19   that claims had accrued or would be waived or not waived by

20   her signing.

21           What is your position if the Court narrows the

22   request along those lines?  Because I'm not sure what you're

23   seeking in number 25, but it seems very broad, to say the

24   least.

25           MS. SULLIVAN:  Could you read one more time, Your

1    Honor, the suggesting, the narrowing you're suggesting?

2         THE COURT:  Yeah.  So they suggest that what you

3    really want here are documents concerning what counsel

4    believed or advised plaintiff concerning whether claims had

5    accrued or would be waived or not waived by her signing the

6    release.

7         MS. SULLIVAN:  Yes.  That's the crux of what we

8    would be seeking to obtain.

9         THE COURT:  So you don't have any objection to

10   narrowing that request if the Court even grants your motion?

11        MS. SULLIVAN:  Well, I would also -- I mean, there

12   are -- the other issue here that's included are documents

13   relating to her and her counsel's decisions:  One, to sign

14   it; and also not revoke it.  Because that also is a critical

15   inquiry, because she had seven days to revoke the release,

16   and the allegations, especially in Paragraph 67 said, "After

17   May 21st, Mr. Friedman concluded that BAE acted to exclude

18   plaintiff from the shipyard..."

19        Now, he wouldn't answer when after May 21st or why

20   or anything like that.  But she had seven days to revoke

21   that release, and so if it was May 21st, we believe that if

22   there was no -- that his communications with her and his

23   state of mind as to that is just as relevant as why she

24   signed it on the 18th.

25        THE COURT:  Why is the revocation or potential

1    revocation of the release important?  Maybe this is a case

2    where she could have her cake and eat it too.  She settles

3    the first case, resolves that matter, but she has a claim

4    that arises after.  What would necessitate her revoking the

5    release, learned that after the 18th that she had another

6    claim?

7           MS. SULLIVAN:  She could have revoked that release

8    and not been paid the consideration, and if she had done

9    that, we wouldn't be here because the class action

10   settlement -- it was a separate supplemental release.  I

11   mean, it was for all claims.  She could revoke the release

12   for any reason.  So she became aware on May 21st that she

13   had a cause of action and she wanted to sue on it instead of

14   getting, you know, the substantial sum of money that she

15   did, she could have done that, but she didn't.

16          THE COURT:  She didn't need to if the claim arose

17   after the 18th, right?  She wouldn't have any need to revoke

18   her prior release and settlement.

19          MS. SULLIVAN:  She, yes.  Yes.  If she truly

20   believed that, which we don't believe, but if she truly

21   believed that it happened -- we don't know what Josh,

22   Mr. Friedman, or when he believed it.  So when he said after

23   May 21st, we don't know why and we don't know when, we just

24   know it was after May 21st, so, yes, if something completely

25   separate had happened, which it didn't, then, yes, she

1    wouldn't have had to revoke the release.

2           THE COURT:  Because request 25 calls for all

3    documents relating to the execution of the agreement and the

4    release, presumably.

5           MS. SULLIVAN:  Yes.

6           THE COURT:  I'm not sure that that would encompass

7    the release in any event.

8           MS. SULLIVAN:  The release?

9           THE COURT:  The revocation of the release, I

10   apologize.

11          MS. SULLIVAN:  Well, we did ask for documents

12   relating to her decision not to revoke the release.

13          THE COURT:  Okay.

14          MS. SULLIVAN:  So some of the things -- I mentioned

15   earlier that there is a lot of evidence in addition to the

16   fact that he put these things in the amended complaint and

17   relied on them and used them and used his state of mind;

18   there are e-mails, there are documents that we tried to

19   examine plaintiff or Mr. Friedman on that we believe

20   directly refute these allegations that there was some sort

21   of agreement or that the cause of action did not arise, and

22   there are many of them.

23          One of them is a March 1st e-mail to me, and that

24   March 1st e-mail from Josh Friedman says things like, again,

25   this is well before the May 18th -- it says, "Morales,"

1    that's the doctor and her longstanding physician, the one

2    that put her out of work, "and Rapaport" -- that is the

3    previous workers' compensation attorney, who is now a judge

4    on the workers' compensation commission so he's not

5    representing the company anymore -- "collaborated to get Ms.

6    Aviles off BAE's books."  That's on March 1st.

7           There is also evidence of retaliation.  There are

8    men who are non-plaintiffs, who are working productively in

9    620 with the same restrictions or worse than Ms. Aviles has.

10   We weren't able to understand any of his state of mind as to

11   why he would write those things if there were no cause of

12   action.

13          There is an April 29th e-mail from Josh Friedman to

14   me that says, "The consequences of failing to keep your word

15   are foreseeable.  You made me look like a fool, and clients

16   do not listen to fools.  Janet will insist reasonably that

17   her counsel abandon what she will now perceive as a long,

18   drawn-out farce and ask the District Court to put her back

19   to work.  Since there is no non-discriminatory reason at

20   this point to continue to keep Janet out of work, that is

21   likely the result of such request."

22          There is a May 2nd e-mail responding to me when I

23   said that I needed to consult with Bob Rapaport:  "I do not

24   have time to write a comprehensive response.  I will on

25   Monday.  It will be addressed to the Court.  Whatever

1    weaknesses you believed that a TRO would suffer from, BAE
2    has cured them by putting Janet through this charade."  That
3    is on May 2nd, he is talking about charades, and, yet, it's
4    not the exact same language but it sure does end up right
5    there in the amended complaint that it was a charade.
6          There is a May 6th e-mail that I sent him
7    forwarding a letter from Bob Rapaport to Ms. Aviles'
8    workers' compensation counsel, because I realized that Josh
9    Friedman was not copied on it, and in that May 5th letter
10   from Mr. Rapaport to Ms. D'Angelo, Mr. Rapaport says, "I do
11   not feel either safe or comfortable advising the yard to
12   return Ms. Aviles to work given what I have received from
13   Dr. Gershon."  That's May 6th.  Then it goes on and on like
14   this all before May 18th.
15         THE COURT:  That all goes really to the merits.
16         MS. SULLIVAN:  But we weren't able -- we tried to
17   ask questions about these things, and they objected on both
18   work product and privilege.
19         THE COURT:  Let me ask you about that.  So if I
20   find a waiver of the attorney-client privilege and work
21   product, is there either some kind of relevance or policy
22   limitation that the Court can graft upon that waiver to
23   ensure that this deposition goes forward in some kind of
24   reasonable fashion and gets that information that really is
25   relevant to the dispute rather than prying, perhaps

1    unnecessarily, into every thought that Mr. Friedman may have

2    had about the case, regardless of whether he's communicated

3    that to Ms. Aviles?

4         MS. SULLIVAN:  Right.  Well, I think there may be,

5    with some instructions like that, and knowing that you're

6    available if the deposition is reopened, that you're

7    available to call if we don't stick to your instructions, I

8    think that would be a reasonable way to do it.

9         We have also, in the second motion we filed, and we

10   filed the first motion before her deposition on the

11   documents, and then during the deposition -- we didn't --

12   the waiver issue was -- I think my partner had called you

13   but that's kind of a big issue to discuss just over the

14   phone with no -- so we supplemented.

15        THE COURT:  That was my conclusion.

16        MS. SULLIVAN:  Yes.  But we supplemented with all

17   of the deposition questions that we believed she should have

18   answered.  So they are in the brief.  If there were a way to

19   craft that we stick to that, I'm certain that we could do

20   that.  I would want to take the depositions with the

21   documents, and I think there may be a way to do that as an

22   initial step, because what happened was we didn't even get

23   the privilege log until after these depositions took place.

24        I think we mentioned in our papers a little bit

25   about the privilege log.  The entries there are sort of all

1   the same, but they clearly show where they are claiming

2   privilege, and I think we could probably fashion something

3   as to the production of them.  The other thing is, if you

4   were worried about just some sort of not having enough --

5   there are attorney-client privilege issues, but there are

6   cases about reviewing them *in camera* first, and maybe you

7   could set some ground rules after that if that were

8   something that you wanted to consider.

9           One of the cases talks about the standards for

10  reviewing *in camera*, and I think that's clearly met.  So

11  that's something that you could do.

12          THE COURT:  Clearly not met, what do you mean?

13          MS. SULLIVAN:  The *Brown v. Tharpe* case, that was

14  the EDVA case from 2012.  That one the Court, before it

15  issued it's opinion, had reviewed *in camera*, and they said

16  that the standard for whether it could be a review *in camera*

17  is that the party invoking an exception to the privilege

18  must make a threshold showing of a factual basis adequate to

19  support a good faith belief by a reasonable person that an

20  exception to the privilege replies.  Once this threshold is

21  made, a judge can review them *in camera* to assist in

22  determining whether an exception applies.

23          I think with the allegations in the complaint and

24  the opinion on the motion to dismiss and the fact that very

25  clearly had those allegations of conclusions and state of

1   mind of counsel not been pled, I think we probably would
2   have prevailed on our motion to dismiss.  So it's definitely
3   relevant, it's definitely relevant to a major defense in our
4   case.  We, of course, have other defenses, as well, but this
5   one is a threshold one that is -- I feel that we are just
6   right back where we started with the motion to dismiss.
7          THE COURT:  All right.  Thank you, Ms. Sullivan.
8   Let me hear from Ms. Schuetz.
9          MS. SCHUETZ:  Thank you, Your Honor.  I think part
10  of what is confusing in defendants' briefing is that
11  defendant, even now, is not distinguishing among the
12  different standards for the different types of materials
13  that it is seeking.  So I want to frame our discussion that
14  way.  We are talking about attorney-client communications,
15  fact work product and opinion work product.
16         A different standard applies to obtain each of
17  those things that are privileged.
18         THE COURT:  With respect to that, I don't want to
19  cut you off, and we can discuss those standards, but if I
20  find waiver with respect to those items, then we are done,
21  right?  I don't have to get to the standards?
22         MS. SCHUETZ:  I think, Your Honor, not exactly.  I
23  think I would say each of those can be waived, but as you
24  were discussing earlier, what it's going to take to show
25  they were waived is a little different for each of them

1   because if you're not pleading an attorney-client

2   communication, then you're not going to waive that

3   privilege, for example, if it helps.

4           THE COURT:  Fair enough.  Go ahead.  Continue.

5           MS. SCHUETZ:  Sure.  So I want to say, first off,

6   on top of what we've discussed so far, plaintiff lodged

7   other objections to these discovery requests, relevance and

8   proportionality, and defendant did not confer, per Rule 23,

9   about those objections and then did not address them in its

10  briefing.  So we've raised that a few times but those are,

11  in fact, a completely independent, different basis to deny

12  the first of their two motions at issue today.

13          So as for these three categories of information,

14  this is what I want to focus on.  Attorney-client

15  communications are the first thing.  And to show there has

16  been a waiver of an attorney-client communication, the

17  defendant has to prove plaintiff is relying on an

18  attorney-client communication and advice of counsel to prove

19  an element of a claim or a defense or to disprove an element

20  of a claim or a defense.

21          So that's the at-issue waiver.  Plaintiff has to

22  put it at issue, a communication at issue by disclosing or

23  describing it in order to prove something.  So defendant has

24  two problems with showing that here.  First of all, there is

25  no attorney-client communication anywhere in the complaint

1   paragraphs defendant is citing.  Your Honor has already
2   noticed and pointed that out.
3           THE COURT:  I asked a question about that.  I
4   haven't concluded that that's not the case.
5           MS. SCHUETZ:  Okay, Your Honor.  Well, certainly,
6   plaintiff's position is there is no communication described
7   in these paragraphs.  It's literally, 31 is Mr. Friedman
8   accepted this thing, which as was discussed earlier, is the
9   description, basically, of his state of mind or a belief but
10  says nothing about any communication between him and the
11  client.
12          Number 37 is about each of their beliefs but not
13  saying anything about who communicated anything to anyone
14  else.  Number 67, again, is just something about a
15  conclusion counsel drew, not mentioning anything about a
16  communication.
17          So I think, honestly, that's actually, as a
18  threshold issue, that's enough to deny the whole thing as
19  far as the attorney-client communications go.  You haven't
20  described one, then you haven't put it in issue.
21          THE COURT:  Let me ask about that.
22          MS. SCHUETZ:  Yes.
23          THE COURT:  If Mr. Friedman is plaintiff's proxy,
24  and he is engaged in this interactive process with
25  defendant, and you've pleaded these types of conclusions in

1    there, at least one inference from that, from your argument

2    about asking the Court to draw reasonable inferences in

3    opposition to the motion to dismiss, is that what he learned

4    he passed on to and communicated to the plaintiff?

5           MS. SCHUETZ:  Well, Your Honor, that's something

6    that could be speculated about but that's not the same as

7    pleading a communication, and we are going to prove

8    something in the case.  I mean, there is obviously an

9    assumption we could all make that every party is relying on

10   the advice of their counsel or talking to their counsel

11   about their claims at all stages of litigation.

12          But that doesn't mean that the party has waived the

13   attorney-client privilege.  So, for example, somewhere in

14   defendants' briefing they say, well, we asked counsel at

15   deposition, and she said she consulted with her counsel with

16   regard to signing the release.  Well, in the same way, we

17   deposed a 30(b)(6) witness for defendant, and she said,

18   well, yes, I consulted with counsel surrounding our decision

19   whether to kick the plaintiff out of the shipyard.  So just

20   because she says that, just because we are aware that each

21   party is consulting with counsel doesn't mean that they have

22   waived the attorney-client privilege with respect to that

23   decision any more than that plaintiff has.

24          THE COURT:  I understand your position.  I guess

25   the difference is they haven't indicated at length sort of

1    what counsel was thinking and doing and believing and

2    concluding in support of a claim that her claim accrued

3    after May 18th.

4            MS. SCHUETZ:  So that is my next point, Your Honor.

5    So maybe we should talk about it.  Plaintiff has not done

6    that.  That's not what plaintiff is doing.  So there are,

7    indeed, mentions of counsel's state of mind in the

8    complaint, and essentially those are extraneous.  They are

9    irrelevant.

10           THE COURT:  Well, but clearly somebody thought they

11   were important enough to put in the amended complaint and

12   that the original complaint needed this information,

13   perhaps, to survive the motion to dismiss.  So do you

14   dispute that plaintiff added those three paragraphs to

15   support her argument that her claims arose after she signed

16   the settlement and release?

17           MS. SCHUETZ:  I think there are parts of those

18   paragraphs that are relevant to a possible equitable

19   estoppel argument, and that might be part of what that's

20   about.  I didn't draft the complaint so I can't tell Your

21   Honor, obviously, this is what I was thinking when I did it.

22           But, no, I mean, primarily plaintiff's argument is

23   that the claims accrued after that date because this is a

24   reasonable accommodation case, and the cases that defendant

25   was citing, I think, were not.  I'm not sure, Your Honor.  I

1    don't have my computer so I can't pull them up and look.

2            But on Page 15 of plaintiff's opposition to

3    defendants' first motion to compel, in note 8 you will see a

4    few cases explaining when claims would accrue in a

5    reasonable accommodation case.

6            THE COURT:  Isn't it that when the plaintiff knew

7    or reasonably should have known of the adverse employment

8    action that forms the accrual?

9            MS. SCHUETZ:  That's true, Your Honor, except that

10   the adverse employment action is not just the initial

11   removing from the shipyard.  So the issue is in a reasonable

12   accommodation case where there is a back and forth about

13   whether or not the plaintiff can be accommodated, "The

14   discrete discriminatory act" -- this is the language from

15   this case *Faircloth* -- "occurred when it was clear that no

16   accommodation would be made, not the day on which plaintiff

17   was placed on medical leave."

18           So basically what we have in this case, and what

19   was actually the basis of the Court's decision on the motion

20   to dismiss, was the fact that there was a continuing back

21   and forth between the parties long after May 18th.  They

22   were still sending information back and forth, medical

23   records to each other, including on May 21st, a couple of

24   days after the date of the signing of the release, when one

25   of defendants' attorneys wrote to plaintiff's counsel and

said, I need to know which of plaintiff's accommodations she
is willing to do without in order to return her.

So there is not a certainty about the outcome of
the interactive process until well after the date of the
release signing.  That's plaintiff's primary argument as to
why the claim hadn't accrued yet.  And that is, in fact,
what we argued in our papers in opposition to the motion to
dismiss.

THE COURT:  Certainly, the appearance is that you
added these paragraphs in the -- I think I agree with you on
the law, and those facts will have to be determined, about
whether that process had sufficiently advanced to a point
which the plaintiff knew or should have known of an adverse
employment action.

So here, perhaps, there is this back and forth
maybe creates some issue or dispute about that, but it
appears that plaintiff amended the complaint to add this
information about the attorney and thus kind of did two
things:  One, she's putting that information at issue with
respect to when the claim accrued; and also to blunt, if you
will, the defendants' affirmative defense that, hey, we had
this contract that said she released everything, and then
three days later her counsel's concluding that, no, she
really hadn't and that she suddenly, a claim came to light.

How do you respond to that?

1          MS. SCHUETZ:  Yes, Your Honor.  Well, I think,

2    again, I agree that it's weird that there is extraneous

3    information in these paragraphs, but there is other

4    information in the paragraphs that's relevant that's part of

5    what is going on here possibly.  If you look at, say, 37,

6    it's talking about a belief, I agree, which, again,

7    counsel's belief is not, in fact, relevant to anything here,

8    but about written and verbal representations made by BAE's

9    counsel.

10         So the way in which that could become relevant,

11   Your Honor, is if defendant were able to prove that the

12   claims accrued before the release was signed, which, again,

13   we disagree with, then plaintiff could try to prove

14   equitable tolling or equitable estoppel and basically argue

15   defendant behaved in a deceptive way, therefore, the Court

16   should permit plaintiff to bring this claim despite the fact

17   that it accrued earlier.

18         But that's not contingent on the subjective state

19   of mind of plaintiff or her attorney.  Equitable estoppel or

20   tolling is centered on the question, basically, what was

21   defendants' conduct, because the question is what would

22   somebody reasonably conclude if they were looking at what

23   defendant was doing.  Would they conclude defendant was

24   acting in good faith or would they conclude defendant was

25   basically trying to obtain something that it was unable to

1   negotiate in the course of the class action settlement by,

2   you know, taking someone out of work on a pretext and then,

3   saying, oh, well, now you've signed a release, we are not

4   going to actually bring you back after all.

5           THE COURT:  I understand your argument.

6           MS. SCHUETZ:  Okay.  The second category, Your

7   Honor, of what defendant is seeking is opinion --

8           THE COURT:  Let me back up a second, though.  Let's

9   say I accept your argument and that this information about

10  what counsel fought and concluded and believed is

11  irrelevant, what constraints, if any, would you have a Court

12  place then on what counsel's role would be in this case

13  going forward, then, Mr. Friedman's role?  You've listed him

14  as a witness.  You say he wants to provide information about

15  the interactive process, but at the same time you want to

16  say, well, this stuff is really irrelevant and should be off

17  limits because it is privileged or protected.

18          MS. SCHUETZ:  Sure.  You're right, Your Honor.  I

19  do think you are pointing to something that is always

20  uncomfortable about attorneys as witnesses in cases.  I

21  think that what's causing the confusion here is Mr. Friedman

22  was never listed as a witness to provide information about

23  his subjective belief as to when claims accrued.  That is

24  not relevant.  It's not something that plaintiff has put in

25  issue in the case.

1          He was identified as a witness because he was in a

2    conversation with defense counsel concerning a doctor who

3    they would be seeking a second opinion from and what would

4    be the procedure for doing that.  So he's identified to

5    testify as to his conversations with the defendant.  In the

6    same way, defendant has identified counsel, including Ms.

7    Sullivan, who is present, as witnesses in this case, as

8    well, to testify about those conversations between the

9    parties.

10         THE COURT:  All right.  Thank you.

11         MS. SCHUETZ:  Sure.  So the second category of

12   information defendant is seeking is opinion work product.

13   That is nearly inviable under precedent in the Fourth

14   Circuit.  The cases are extremely clear it is only

15   discoverable in extraordinary circumstances.

16         THE COURT:  That goes back to my first question,

17   which is if you've waived it, then by placing and pleading

18   his opinions in the complaint, which you have, then doesn't

19   that go out the window?

20         MS. SCHUETZ:  It's conceivable that there could be

21   a case where an attorney did waive opinion work product, but

22   our contention is certainly that that is not what has

23   happened here.  Merely saying, basically, plaintiff's

24   counsel felt that defendant had done something

25   discriminatory, which is basically what these paragraphs

1    say, is the equivalent of what plaintiff's counsel might say

2    to the press in a case like this.

3           You could have a plaintiff's attorney doing an

4    interview and saying defendant discriminated against my

5    client by putting her off of work, and we expect to prevail

6    in the claims in this case.  That's not a waiver of attorney

7    opinion work product, which is the most sacrosanct category

8    of privileged information in litigation.

9           Defendant really hasn't shown -- I mean, this is --

10   it's very ill-defined even what defendant thinks that

11   something like that would encompass.  I think the

12   defendants' position appears to be that merely making the

13   statement my client was discriminated against is revealing

14   opinion work product and could potentially open up broadly

15   maybe anything about the attorney's opinions about the case.

16          THE COURT:  Well, I mean, is the waiver limited to

17   the opinion that was expressed?  In here, I mean, it's not

18   simply not that he said the defendant engaged violative of

19   the law.  He is indicating on specific dates certain beliefs

20   and conclusions to support the claim that your client's ADA

21   claim did not accrue until after May 18th.

22          MS. SCHUETZ:  Well, again, Your Honor, I think that

23   comes back to the fact that, again, our position is that we

24   are not relying on what he subjectively believed on those

25   dates to show that the claim hadn't accrued.  There is a

1   different basis for argument that the claim hadn't accrued,

2   which is that the interactive process was ongoing.  It was

3   simply not ripe yet.

4        THE COURT:  Well, let me ask you this:  If I rule

5   against you on the waiver issue in the case, if we look at

6   plaintiff's deposition, if I allow her to be re-deposed and

7   the work-product protection objections are gone, in whole or

8   in part, can you foresee any additional concerns that the

9   Court needs to address concerning plaintiff's deposition,

10  should it be taken again?

11       MS. SCHUETZ:  That raises a huge raft of concerns,

12  Your Honor, including the fact that defendant hasn't even

13  defined what questions it believes it's entitled to ask.  It

14  basically gives a couple of examples in its briefing.  But

15  it is incredibly ill-defined what is the scope of what

16  defendant feels it's entitled to ask if all these things are

17  waived.

18       Also, Your Honor, I guess I'm not sure when you're

19  asking that question whether you are saying in this

20  hypothetical that like the privilege with respect to all

21  attorney-client communications and all work product, both

22  opinion and fact has been found to have been waived or is

23  something more narrow?

24       THE COURT:  Well, let's play it out.  Let's say

25  that to the extent that there are communications between

1    counsel and plaintiff that go to the question of what she

2    knew or reasonably should have known about when an adverse

3    employment action occurred and/or that she was made party to

4    or privy to fact or opinion work product that informs her

5    state of mind with respect to that issue, that she could be

6    asked about such matters?

7         MS. SCHUETZ:  Well, Your Honor, I think one concern

8    with that is I'm having trouble at this point distinguishing

9    what makes that situation different from any reasonable

10   accommodation case where plaintiff was represented by

11   counsel during the course of negotiations with the adverse

12   party.

13        I mean, it sounds like, again, based on, you know,

14   the argument of defendants that would be excepted in that

15   circumstance, that in basically every case where a plaintiff

16   was represented and was presumably talking with her counsel

17   about her reasonable accommodation claims, then the

18   defendant could say, well, she's waived the attorney-client

19   privilege with respect to those claims because she could

20   have known at some earlier point, based on what her counsel

21   said, that she had claims, and, you know, how do we know

22   what counsel said unless we can ask her?

23        That is just not the law, and we've cited cases,

24   reasonable accommodation cases where, you know, the courts

25   have pointed out that kind of fundamental problem.  I

1   also think that that opens up just kind of an astronomical

2   amount of potential questions about basically any advice

3   that counsel gave to plaintiff concerning her claims and

4   would be extraordinarily difficult for practical purposes to

5   limit, particularly given defendant didn't, you know,

6   identify specific questions, basically, that it actually

7   wanted an answer to other than giving a couple of examples.

8           THE COURT:  Do you have any argument on defendants'

9   claim that, whoever it was defending these depositions,

10  engaged in inappropriate conduct with respect to the

11  depositions?

12          MS. SCHUETZ:  Sure, Your Honor.  I think our papers

13  do speak well for themselves regarding that subject, and I

14  certainly would encourage Your Honor to go ahead and look at

15  the deposition transcript, and it should be apparent on the

16  face of it that those were not appropriation objections, but

17  actually, Your Honor -- hold on one second.  Just to give

18  you a sense, Your Honor, of the fact that in this case,

19  because it is a circumstance where attorneys are being

20  deposed, which causes everyone generally a lot of discomfort

21  and difficulty with dealing with privilege issues in real

22  time, when defendants' counsel, Ms. Sullivan, was deposed,

23  it was a very similar circumstance from Mr. Willner with

24  regard to what types of objections he made and how much

25  speaking he needed to do to confine her responses to

1    non-privileged subjects.

2         So just as an example, there were objections in her

3    deposition from Mr. Willner, one of defendants' counsel,

4    that says, "I'm going to object to the extent you're asking

5    about what one counsel said to other counsel on the same

6    side.  I think what was being sent was privileged.  The

7    correspondence between Mr. Rapaport and Ms. D'Angelo is not

8    privileged, and that had been produced.  I think whether or

9    not Mr. Rapaport said this to Ms. Sullivan is privileged.

10   That's a communication between counsel to which no one else

11   is a party, so I think I have to instruct the witness not to

12   answer that question."

13        So that's obviously a long objection.  Obviously,

14   there are circumstances where that kind of thing could be a

15   speaking objection, but basically that happened throughout

16   the deposition because everyone was trying to figure out,

17   okay, what is privileged in real-time.  I think that is what

18   you will see also with regard to the objections made in the

19   deposition of Mr. Friedman.

20        THE COURT:  I guess the concern the Court had is

21   that it's not appropriate to filibuster during these

22   depositions, and I do understand that when an attorney is

23   being deposed and taking and/or defending such a deposition

24   that it's stressful and people need to be very careful about

25   what is and is not said, but it strikes the Court that if

1    there is to be any continued deposition of Mr. Friedman,

2    that it's going to be very important to prep him in advance

3    about what is and is not allowed consistent with any rulings

4    that the Court may make in the case and not have this sort

5    of running sort of narrative and interrupted answers and

6    those kind of constant filibustering.

7            It seems to me, and I think when you ultimately get

8    to the end of a lot of these objections, they arguably were

9    reasonably asserted.  But the problem is, is that there was

10   just so much back and forth and interjecting that instead of

11   saying, objection, that calls for work product information,

12   there is ten pages of transcript arguing about it.

13           To a certain extent it's both counsel, but if there

14   is going to be a future deposition, the Court will not look

15   favorably upon that kind of filibustering in the future,

16   quite frankly.  I think that's an important message to send

17   and deliver.

18           MS. SCHUETZ:  Your Honor, with regard to fact work

19   product, which is the third category of privileged

20   information defendant is seeking, defendant, in addition to

21   basically asserting just the same waiver argument on the

22   basis of these couple paragraphs of the complaint, says in a

23   conclusory manner that also it should be able to obtain

24   these things through a showing of substantial need and

25   inability of that undue hardship to obtain substantially

1    equivalent material, and I just wanted to point out, Your

2    Honor, that that is a completely conclusory argument.

3         Defendant has not explained why they need

4    something, why they can't get it from somewhere else, other

5    than purely by reference back to the idea that this is in

6    the complaint and they should be entitled to get it because

7    it's in the complaint.

8         I do want to point out also, Your Honor, defendant

9    has claimed that plaintiff relied over ten times on these

10   things in opposition to the motion to dismiss, and, in fact,

11   Paragraph 67 is not actually cited anywhere in plaintiff's

12   opposition to the motion to dismiss that I can find.  The

13   other two are only referred to twice in a general manner.

14        So I think defendant is trying to create a much

15   bigger -- to blow something that is really basically a

16   couple of irrelevant paragraphs, a couple of extraneous

17   information in a complaint, into something that is much more

18   substantial.

19        THE COURT:  With respect to they haven't explained

20   why they need it, wouldn't you agree that the only place

21   they could get information about plaintiff's state of mind

22   is from plaintiff, to the extent that you have indicated

23   that she believed that the interactive process, it was

24   continuing in good faith and arguably believed that because

25   counsel had communicated that to her as of May 18th when she

1    signed the deposition?

2            The only place they could get that information is

3    from the plaintiff herself and/or from communications made

4    by Mr. Friedman to the plaintiff about what she knew or

5    reasonably should have known about the status of any adverse

6    action against her.

7            MS. SCHUETZ:  That's correct, Your Honor, with sort

8    of two limitations:  One being that they did get to ask the

9    plaintiff about her state of mind, I mean, a separate

10   question from whether they could ask the plaintiff about her

11   communications with counsel, that, they could not do.  But

12   they asked, you know, do you have any documents reflecting

13   plaintiff's state of mind that are not privileged, and we

14   agreed to give them that if there were any.  There aren't.

15   But that was not an objection that we made in our discovery

16   responses.  Secondly, that they -- I'm sorry, Your Honor.

17   I'm actually losing the point.

18           THE COURT:  I think you answered my question.  So

19   is the privilege log, is that the universe of documents that

20   are potentially responsive to the four production requests?

21           MS. SCHUETZ:  Yes, Your Honor.  We have served a

22   privilege log.  There shouldn't be anything unlogged.

23           THE COURT:  Very well.  Thank you, Ms. Schuetz.

24   Unless you have anything further?

25           MS. SCHUETZ:  No, Your Honor.

1          MS. SULLIVAN:  Briefly?

2          THE COURT:  You may.

3          MS. SULLIVAN:  Thank you, Your Honor.  Okay.  Just

4   a few points.  I don't want to belabor things, but the

5   representation that we are blowing something out of

6   proportion, that there is irrelevant information into the

7   complaint, that this information was irrelevant, is,

8   frankly, very curious argument.  The argument that this was

9   like talking to the press, my client was discriminated

10  against, we don't see it that way at all.  It's not just in

11  the complaint.  It is in the motion to dismiss:  "On May

12  18th, 2015, Ms. Aviles and her counsel reasonably believed,

13  based on the written and verbal representations of BAE's

14  counsel that" -- and it goes -- that's the same exact thing

15  from Paragraph 37, "The reasonable inference to which

16  plaintiff is entitled is that her retaliatory termination

17  claims accrued after she signed the SA and the release, and,

18  therefore, could not have been waived."

19          This is not extraneous, this is not irrelevant

20  information material, particularly when you look at the

21  timing of how it was inserted after we filed our first

22  motion to dismiss.  So I take great issue with that.

23          A couple of other things.  Again, I think that the

24  case law, particularly on the ADA, and when something

25  accrues, and if you're just affirming, reaffirming a

1    decision that was made, that is not an independent decision.

2    However, even if we take opposing counsel's argument that it

3    doesn't end until the interactive process ends, that's only

4    one of the claims in this case.

5         There is two Title VII causes of action, and that's

6    retaliation and gender discrimination.  Just based on the

7    documents that we obviously weren't able to ask Mr. Friedman

8    about, the *Delaware College v. Ricks* case, it's when an

9    adverse action is communicated to a plaintiff.  In that

10   case, that's a Supreme Court decision.  I think I have the

11   cite.

12        THE COURT:  That's fine.  I have it.

13        MS. SULLIVAN:  You know that one.  But that one was

14   where they were told you're going to have to go, and there

15   was a whole grievance process and lots of things happened

16   afterwards.  The Court said no, it's when you learned of the

17   adverse action.  So there is an ADA claim, certainly, but

18   there are two other claims in the case, too, and we are

19   entitled to defend on those claims as well.

20        I think those were my main points in response.

21   Talking about the filibustering during the deposition, and I

22   know it's in our papers, and I won't go on about it, but

23   there were times when opposing counsel interrupted

24   Mr. Friedman when he was getting ready to testify about his

25   discussions with me, and it was clearly coaching, and it

```
 1    kind of shut down that.
 2            I know we put the transcript in, but I do think
 3    that it very much elongated the depositions, and in
 4    plaintiff's deposition, we actually ran out of time, and
 5    they walked out because we had been on the record for seven
 6    hours, and we weren't finished.  So I just wanted to respond
 7    briefly on that.
 8            Do you have any questions for me?
 9            THE COURT:  I don't think I have any further
10    questions, no.
11            MS. SULLIVAN:  Thank you.
12            THE COURT:  All right, counsel.  Thank you for your
13    arguments today.  The Court is going to take this matter
14    under consideration.  We will issue a written ruling, and we
15    will see where we go from there.  I would like to chat with
16    counsel in chambers briefly after this, if you will come
17    back around, go out that door and come around and go down
18    the long hallway.  I want to follow up on one issue that has
19    nothing to do with these motions.
20            MS. SULLIVAN:  Sure.
21            THE COURT:  Thank you.
22            (Hearing adjourned at 12:18 p.m.)
23
24
25
```

```
 1                         CERTIFICATION

 2

 3       I certify that the foregoing is a correct transcript

 4   from the record of proceedings in the above-entitled matter.

 5

 6

 7          X_____/s/_____x

 8                       Jody A. Stewart

 9             X_____11-8-2017 _____x

10                          Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JODY A. STEWART, Official Court Reporter